IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL KELLER, | | CIVIL ACTION |
| Plaintiff, | | |
| v. | | |
| JAMES CRAWFORD, | | NO.  19-4873 |
| Defendants. | | |

## OPINION

Plaintiff Paul Keller brings a lawsuit pursuant to 42 U.S.C. § 1983 alleging that

Defendant James Crawford,[1] an officer with the Lower Providence Police Department, used

constitutionally excessive force against him in violation of the Fourth Amendment in an

incident outside Plaintiff's home while Plaintiff was being treated by medical emergency

personnel for a seizure.  Defendant moves for summary judgment.

## I.    FACTUAL BACKGROUND

Plaintiff is a diabetic with a past history of diabetic seizures.  On December 31, 2018, he

asked his neighbor, Tom Razzi, to drive him to the nearby Turkey Hill for a coffee because he

was not feeling well and was worried about his sugar levels.  Razzi agreed to do so.  When they

arrived at the parking lot, he got out of the truck and headed into the store, but soon noticed

Plaintiff was not following.  Returning to the truck, he found Plaintiff passed out.  Razzi did not

have his phone with him and so quickly drove the short distance back to Plaintiff's house and

yelled for someone to call 911.  Plaintiff's daughter, Hollie Keller, made the call and told the

dispatcher that her father, who often did not comply with his medications, was having a diabetic

---

[1] Keller initially filed his suit against the Lower Providence Police Department, the Township of Lower Providence, and Officer John Doe.  Upon identification of Defendant Crawford, those parties were all terminated, and Crawford was substituted.  Crawford is the only Defendant remaining in the case.

seizure.  His wife, Cheryl Keller, also came out.  Both Razzi and Hollie attempted to care for Plaintiff, who was "vibrat[ing]" and "flailing" in the passenger's seat of the truck, until the help arrived.

Two Emergency Medical Technicians ("EMTs") and three police officers arrived shortly. One of the EMTs attempted to take Plaintiff's hand to conduct tests but struggled as Plaintiff continued to flail in the car.  In the midst of this, Plaintiff's hand struck her face.  According to Hollie and Cheryl, it was an open handed hit caused by Plaintiff's convulsing.[2]  The EMT reassured Hollie and Cheryl that it was okay, she has "been through this before with people that have had something wrong with them."  Plaintiff himself has minimal recollection of what happened:  He describes himself as "out of it," feeling like he was "being attacked,"[3] and "just swinging [his] arms," but does not know what exactly happened.

Promptly following the strike,[4] Defendant grabbed Plaintiff—according to Hollie and

---

[2] Razzi describes the strike as a "punch."  At the summary judgment stage, all inferences are taken in Plaintiff's favor, and so to the extent the difference between a punch and open-hand slap has significance, it shall be construed as open-handed.

[3] Defendant interprets Plaintiff's statement that he "felt attacked" to be an unequivocal explanation for why he struck the EMT.  But the full context of Plaintiff's statements when questioned at his deposition makes it clear that is not what Plaintiff was saying:

> Q. Why did you punch the paramedic?
> A. I don't know. Why would anybody do something like that?
> Q. I don't know.
> A. You would have to be under duress or something.
> Q. You were under duress when you punched her?
> A. I feel like they were attacking me, whoever was attacking me. I felt like I was being attacked.
> Q. So you defended yourself?
> A. No.
> Q. You felt like you were being attacked –
> A. I was just not there. I was like out of it. I was just swinging my arms, I don't know what happened.
> Q. Do you remember swinging your arms?
> A. They said I was.

Keller Deposition p. 26.

[4] It is unclear from the record whether Defendant directly witnessed Plaintiff strike the EMT or was told about it by the EMT.  But it is not contested that he was aware of the incident before approaching Plaintiff.

Cheryl, by his chest and shoulders, but according to Razzi, by the ankles—and forcefully yanked him out of the truck.  Defendant pulled Plaintiff onto the street, where he hit stomach-first.  Defendant handcuffed Plaintiff and pulled his hands "up towards his head," holding them there.  Defendant also used his knee to keep control over Plaintiff.  According to Razzi, Defendant stood up, "jumped up in the air a little bit and . . . kneed" Plaintiff with "all his weight."  According to Cheryl and Hollie, Defendant kept steady pressure on Plaintiff's back with his knee, with Cheryl describing Defendant as "digging his knee" into the back.  Plaintiff began crying.  He repeatedly asked Defendant what he did wrong, told Defendant that he was hurting him, and told Defendant he was cold.  Cheryl and Hollie likewise protested Defendant's actions and asked for Plaintiff to be taken off the street, noting that it was cold and sleeting. The EMT repeated that she was fine and understood that this could happen when someone has a seizure.

This continued for roughly ten minutes until Plaintiff was placed on a stretcher and taken to the hospital.  The handcuffs were removed after he arrived at the emergency room.  He was later transported to a different hospital, where he required emergency surgery to repair a "burst fracture" in his back.  Plaintiff remained in the hospital for approximately six days after surgery, then spent twenty days at a rehabilitation center.  He will need to undergo a second surgery to finish repairing issues related to the fracture.  No charges were pressed against him related to the incident with the EMT.

## II.    <u>LEGAL STANDARD</u>

Summary judgment is appropriate only if "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  A

fact is "material" if it could affect the result of suit under governing law. *Id.* In evaluating a summary judgment motion, all facts must be viewed in the light most favorable to the nonmoving party, and any reasonable inferences must be made in their favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

## III.   <u>DISCUSSION</u>

Section 1983 creates a "species of tort liability," *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976), under which persons who are subject "to the deprivation of any rights, privileges, or immunities secured by the Constitution" by a state official can bring suit against the official. Thus, in any section 1983 lawsuit, the threshold issue is whether there was a specific constitutional violation: at issue here, the Fourth Amendment right to be protected from excessive force. *See Saucier v. Katz*, 533 U.S. 194, 204 (2001). The court must identify the elements and rules of showing such a constitutional violation in order to determine whether one occurred. *Id.* If the plaintiff proves a violation, he is entitled to compensatory damages to the extent he can prove the constitutional violation caused his injuries. *See, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 258 (1978). Additionally, punitive and nominal damages are also available in appropriate circumstances. *See Smith v. Wade*, 461 U.S. 30, 56 (1983); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986).

Defendant argues that the force was not excessive, and that even if it was, he is protected by qualified immunity. Qualified immunity is a doctrine designed to give "government officials breathing room" by providing them immunity from suit when they "make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Thus, if Defendant is protected by qualified immunity, Plaintiff's suit against him under section 1983 fails. In *Saucier v. Katz*, the Supreme Court mandated a two-step process for deciding

whether qualified immunity applies.  533 U.S. at 201-02.  First, the court must decide whether the facts the plaintiff alleged make out a violation of a constitutional right.  *Id.*  Second, if the first step is satisfied, the court must decide whether the right at issue was "clearly established" and whether the officer was behaving unreasonably.  *Id*.  But as courts implemented *Saucier*, it quickly became apparent that such a rigid formulation was unworkable; for example, forcing judges to decide thorny areas of unsettled constitutional law, even when it was apparent that the plaintiff would lose on qualified immunity grounds, ran afoul of the doctrine of constitutional avoidance.  *See Pearson v. Callahan*, 555 U.S. 223, 240-41 (2009).  Reflecting on the issues that arose, in *Pearson*, the Supreme Court reversed course.  *Id.* at 242.  Now, district courts have flexibility to decide whether to engage in the two-step procedure set out in *Saucier* by starting with the constitutional question or whether they want to proceed directly to the second step, the question of whether the right at issue in the case was clearly established.  *Id.*  Proceeding directly to the second step is of most utility when it is readily apparent that the law on the issue is unsettled—for example, when there is no binding precedent on point.  Finding that not to be the case here, *see infra* Part III.B, the Court chooses to engage in the traditional two-step procedure; thus the first step is to determine whether the facts in the record, taking all inferences in Plaintiff's favor, establish a violation of the Fourth Amendment right to be free from excessive force.

### A.  Did Defendant Use Constitutionally Excessive Force?

Individuals are protected from the use of excessive force in the non-custodial setting under the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Thus, a person bringing a Fourth Amendment claim must show both that they were seized within the

meaning of the Fourth Amendment, and that such seizure was unreasonable.  *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004).  A seizure occurs "[w]henever an officer restrains the freedom of a person to walk away."  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (citation omitted).  Neither party disputes that Plaintiff, who was handcuffed by Defendant, was seized for purposes of the Fourth Amendment.  The only question is whether that seizure was reasonable.

Fourth Amendment reasonableness evades a clear-cut test; instead, it calls for an assessment of the officer's behavior under the "totality of the circumstances," in light of the "facts and circumstances confronting them."  *Estate of Smith v. Morasco*, 318 F.3d 497, 515 (3d Cir. 2003) (citing *Graham*, 490 U.S. at 397)).  Factors to consider include:

> [T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight, *see Graham*, 490 U.S. at 396, as well as the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. . . .

*Id.*  These factors reflect the need for careful balancing of the nature and quality of the intrusion on the person's Fourth Amendment rights against the countervailing governmental interests at stake.  *Graham*, 490 U.S. at 396.  Thus not all inflictions of force are considered excessive under the Fourth Amendment: "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id*.

The determination must be judged from the perspective of a reasonable officer on the scene, not with the "20/20 vision of hindsight."  *Id*.  It is an objective standard that embodies an allowance for the fact that officers are often forced to make split-second judgments, frequently in circumstances that are difficult and evolving rapidly.  *Id.* at 396-97.  An officer's intentions do not matter—bad will does not make the force unreasonable, nor can good intentions save an

officer who used too much force.  *Id.* at 397.

"Reasonableness" in this context "resembles tort law in its attention to how a specific, concrete circumstance should affect an officer's judgment."  *Abraham v. Raso*, 183 F.3d 279, 289-90 (3d Cir. 1999).  In light of this, reasonableness should "frequently remain a question for the jury.  To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared."  *Id.* at 290.

Plaintiff argues that, in kneeling on his back after he was handcuffed and compliant, Defendant used excessive force.  He notes that when Hollie called 911, she informed the operator that her father was having a diabetic seizure, and all first responders present, including Defendant, were aware that this was an ongoing medical emergency, not a crime scene.  The parties and witnesses dispute how, exactly, Plaintiff struck the EMT and the force with which Defendant's knee made contact with Plaintiff's back.  But neither dispute that Plaintiff did, in fact, strike the EMT and Defendant's knee was on contact with Plaintiff's back for the ten-minute duration between when he was removed from the truck and the ambulance took him away.  Likewise neither party disputes that Plaintiff was resistant to receiving medical attention from the EMT and resistant to exiting the truck, but was compliant once he was handcuffed.

Based on Defendant's knowledge that the Plaintiff struck the EMT—whether intentional or not—and Plaintiff's resistance to the EMT's attempts at providing medical care, Defendant was justified in employing some amount of force to take control of the situation to prevent Plaintiff from harming others or himself.  *See Anthony v. Seltzer*, 696 F. App'x 79, 82 (3d Cir. 2017) (drawing a distinction between using force to subdue a noncompliant person having a

seizure and using force once the person was subdued, and holding the latter, but not the former, to be excessive). But it is not the initial use of force that is at issue here: it is the *continued* use of force once Plaintiff was handcuffed on the ground.

None of the factors identified in *Graham* and *Morasco* support the continued use of force here. Turning to the first *Graham* factor, the severity of the crime: this application of force did not occur in the context of a suspected criminal action. Instead, the police were on the scene to *help* Plaintiff, who was in the midst of a medical emergency. While Plaintiff did strike the EMT, he was not charged in connection with the incident. And more saliently, taking all inferences in Plaintiff's favor, the hit happened in the throes of a seizure or in its immediate aftermath. As the EMT acknowledged on the scene, Plaintiff was flailing and lacked meaningful control over his actions. *See Rivas*, 365 F.3d at 200 (noting that even if the officer perceived the facts differently, such a matter cannot be decided at the summary judgment stage). Thus, given that there was no underlying crime in this case, even considering the need to bring the Plaintiff under control, once that was accomplished, this factor weighs against any lengthy, continuous use of force. *See e.g. Morasco*, 318 F.3d at 516 (holding that when police are responding to a "minor complaint," the severity of the crime weighs against strong use of force).

The next two *Graham* factors are whether Plaintiff posed an immediate threat to the safety of the officers or others and whether Plaintiff was evading arrest. As noted, Plaintiff striking the EMT and resisting help justified the initial force. But none of the witnesses whose testimony is included in the record on summary judgment testified that, once Plaintiff was facedown handcuffed on the street, he continued to struggle. By all accounts, once handcuffed, the most Plaintiff did was plead with Defendant to stop hurting him—it appears he was physically compliant and mentally with it enough at that point to cry out in pain. Further, there

are no allegations that Defendant feared Plaintiff could be dangerous beyond his flailing or that he was armed.  *Compare with Sharrar v. Felsing*, 128 F. 3d 810, 822 (3d Cir. 1996) (noting that police were attempting to apprehend four suspects, one of whom was believed to have a gun).

Finally, turning to other relevant factors identified by the Third Circuit, *Morasco*, 318 F.3d at 515, as discussed *supra*, when arriving at the scene, Defendant had no reason to believe Plaintiff to be "violent or dangerous," *id.*, beyond the context of his flailing on account of the seizure.  As to the duration of the action, fifteen to twenty minutes elapsed from the arrival of the EMTs to Plaintiff leaving on a stretcher.  Roughly ten of those minutes—the majority or more of the time—Plaintiff was handcuffed and subdued on the ground.  Although Plaintiff resisted care from the EMT for the first few minutes, he was pulled out of the car and subdued nearly immediately after striking her.  Given that Plaintiff only represented a threat prior to being handcuffed, taking all inferences in Plaintiff's favor, the duration of any threat was just minutes long and ceased once he was cuffed.  *See Seltzer*, 696 F. App'x at 82 (noting that force cannot legitimately be used against a plaintiff who has been subdued after initially resisting authority and thus poses "no ongoing threat").  Finally, while the presence of other persons on the scene may have somewhat heightened Defendant's need to maintain control over the situation, *see Morasco*, 318 F.3d at 515, which could potentially justify continued force, there is no contention that anyone on the scene was armed, noncompliant, or presented a threat to the officers that required continued force against Plaintiff.  While Razzi acknowledges he got into a verbal altercation with another officer, he had no weapon and it does not appear he attempted to interfere in any way with Defendant's control and the EMT's care of Plaintiff.

In sum, taking all inferences in Plaintiff's favor, no factor identified by the Supreme Court or Third Circuit weighs in favor of the continued exercise of force in this case after

Plaintiff was subdued.[5]  Once Defendant subdued and handcuffed Plaintiff, whatever threat

Plaintiff may have posed to himself or others was over.  "[F]orce may not legitimately be used

against an individual who is compliant and poses no ongoing threat to himself or others, or who

is not resisting arrest, even if he was initially non-compliant."  *Seltzer*, 696 F. App'x at 82; *see*

*also Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057-58 (9th Cir. 2003)

(holding that after the plaintiff "was handcuffed and lying on the ground, the force [of two

officers pressing their weight into plaintiff's neck and torso] was clearly constitutionally

excessive when compared to the minimal amount that was warranted"); *Champion v. Outlook*

*Nashville, Inc.*, 380 F.3d 893, 902-03 (6th Cir. 2004) (holding that it was objectively

unreasonable force to pepper spray and put pressure on the plaintiff's back once he was

facedown and restrained); *cf. Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (noting that the

Supreme Court's holding that the force was not excessive "would be a different case" if the

initial application of force "clearly incapacitated Rickard and had ended any threat of continued

flight, or if Rickard had clearly given himself up").  Defendant was called to the scene to deal

with a medical emergency, not a crime scene.  With all inferences in Plaintiff's favor, the

Defendant's actions were objectively unreasonable.

### B.  Were Defendant's Actions an Unreasonable Violation of a Clearly Established Right in this Case?

Because Plaintiff presented evidence from which a jury could conclude that Defendant

violated his constitutional rights, the next question is whether that right was clearly established.

---

[5] Defendant argues that his behavior was consistent with "his training and the best practices of law enforcement throughout the country."  He cites for support a report by Ronald Traenkle, a "Police Liability expert" which discusses law enforcement tactics for subduing resisting persons.  Treankle also analyzed the appropriateness of Defendant's actions in this specific case, relying on a narrative of the facts that fails to take all inferences in Plaintiff's favor.  A jury could find Traenkle's analysis that the tactics were proper persuasive—but such credibility determinations can only be made by a jury.  *See Anderson*, 477 U.S. at 255.  And despite Defendant's reference to his department's specific training, he failed to point to evidence in the record before the Court at summary judgment describing his training.

In order to be clearly established, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). It cannot be defined at a high level of generality, such as "the right to be free from excessive force," but instead must be tied to the specific circumstance presented. *Plumhoff*, 572 U.S. at 779. This is "not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). To be clearly established does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. In this case, the right at issue was Plaintiff's right to be free from excessive force when he was unresisting and ceased to present a threat to the officers.

At the time of the incident at issue here, it was clearly established that once an individual is subdued and not resisting, that individual no longer poses a sufficient threat to warrant the continued application of force, specifically the force of an officer pressing their body weight through the force of their knee into the back of a handcuffed person lying face down on the pavement. For example, in *Rivas v. City of Passaic*, although many facts were disputed, the officers similarly were called to assist with an individual having a seizure who resisted care and got into altercations with the EMTs and officers. 365 F.3d at 200. In that case, three officers allegedly pressed down on the plaintiff's back after he was handcuffed and subdued. *Id.* The Court concluded that, a "reasonable jury could find from these facts that Mr. Rivas did not present a threat to anyone's safety as he lay in a prone position on the enclosed porch, hands and ankles secured behind his back. . . . Assuming that Mr. Rivas was handcuffed and had his ankles tied at that time, a reasonable jury could find that the *continued use of force* against Mr. Rivas

11

was excessive." *Id.* (emphasis added).[6]  While the officers in that case applied more force (three officers on the plaintiff's back versus one), the alleged resistance and threat posed by the plaintiff was likewise higher—for example, the officers alleged that at one point, the plaintiff reached for an officer's gun.  *Id*. at 199.  Furthermore, Third Circuit case law repeatedly stresses that force is not to be continually applied to a compliant, non-threatening person.  *See Morasco*, 318 F.3d at 516 (faulting district court for failing to account for the minor complaint to which officers were responding and low level of threat plaintiff presented); *Seltzer*, 696 F. App'x at 82 (holding that force cannot be used against a compliant, non-threatening individual); *Bornstad v. Honey Brook Twp.*, 211 F. App'x 118, 124 (3d Cir. 2006) (holding that while reasonable officers should know that "squeezing the breath" from a "compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable," it was not clearly established whether such force is unreasonable when the individual continued to "violently resist arrest") (internal quotation and citation omitted).  In light of pre-existing caselaw, the unreasonableness of Defendant's actions was apparent and clearly established.  *Anderson*, 483 U.S. at 640.

Nevertheless, Defendant may still be protected by qualified immunity if he made a reasonable mistake.  An "officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances;" so long as that mistake was reasonable, he remains protected.  *Saucier*, 533 U.S.

---

[6] Defendant defines the right at issue as "the right to be free of excessive force by the police when being restrained for life-saving medical treatment from police and paramedics summoned by your immediate family," then attempts to further narrow the right to situations where the individual is suffering from a diabetic seizure.  Even under Defendant's narrowest conception of the right—which is unduly narrow, *see al-Kidd*, 563 U.S. at 741 (noting that clearly established does "not require a case directly on point")—the right remains clearly established, as *Rivas* dealt with the precise circumstance of officers being called to handle a person having a seizure and applying excessive force in the course of attempting to restrain him.  Defendant's citation to an unpublished case from the District of New Jersey in which the officers were responding to a report of disorderly conduct and were concerned the muscular, resisting plaintiff may have been armed does not change this analysis.  *See Ayala v. McCormick,* 2014 WL 1292668, at *3 (D.N.J. Mar. 31, 2014).

at 205.  Although mindful that officers frequently must make split-second decisions in difficult,

escalating situations, taking all inferences in Plaintiff's favor, a jury could conclude that

Defendant's actions in this situation simply were not reasonable.  Plaintiff was largely

incapacitated as a result of having a seizure.  Defendant was called to the scene not because

Plaintiff committed a crime, but because he needed help.  *See Morasco*, 318 F.3d at 516

(emphasizing that the severity of the reason for which officers were called must be taken into

consideration).  The only threat Plaintiff posed was an open-handed strike against the EMT—a

strike which the EMT reiterated several times did not concern her in that it is commonplace

amongst those having a seizure—and Plaintiff's resistance to receiving medical attention.  By all

accounts in the record, once Plaintiff was removed from the vehicle and handcuffed, he was

subdued.[7]  And Defendant was on notice that his action of digging his bodyweight through his

knee into Plaintiff's back was hurting him.  Plaintiff himself repeatedly asked for the pressure to

be relieved, and his wife, daughter, and neighbor who were watching all expressed alarm.

Defendant had no reason to believe Plaintiff was armed or otherwise violent.  In light of all of

these circumstances, a jury could conclude that it was objectively unreasonable for Defendant to

continue to apply force to the subdued Plaintiff.  *See Abraham*, 183 F.3d at 289-90 (explaining

that reasonableness is a concept typically best left to the jury).

### C.  Can Plaintiff Prove that Defendant's Actions Caused his Harms?

Defendant next argues that, even if Plaintiff established that Defendant violated his

---

[7] Neither party explores whether the Plaintiff was under arrest during the incident.  Nevertheless, Defendant attempts to justify the reasonableness of his force by citing to Pennsylvania state law that justifies "the use of any force" the officer believes to be "necessary" to effect *arrest* upon a *resisting* person.  *See* 18 Pa. C.S.A. § 508 (West 2007).  According to Defendant, that law supported Defendant's belief that it was reasonable to use force in this circumstance.  But beyond citation to the statute, Defendant provides no real analysis of its application here.  And more saliently, the law in question does not help Defendant.  Plaintiff does not challenge that Defendant was entitled to use some amount of force to bring Plaintiff under control when he was non-compliant.  Instead, as set forth above, the issue in this case is the use of force when Plaintiff was already handcuffed and *unresisting*.

constitutional rights, he fails to show that Defendant's actions caused the injuries alleged in the

Complaint.  According to Defendant, the undisputed evidence in the record establishes that

Defendant's actions did not and could not have caused Plaintiff's fracture, citing a report

provided by Dr. Mark Manzione, who Defendant hired to analyze Plaintiff's injuries.  According

to Manzione, a "tonic-clonic seizure," or grand mal seizure, is capable of causing vertebrae burst

fractures, but the force applied by Defendant's knee physically could not.  A "narrative report"

filed by Plaintiff's treating physician, Eric Williams, contradicts that conclusion, noting that

Plaintiff's injuries were caused by Defendant's actions.  Defendant, however, argues that

Williams was not properly identified as an expert, and thus cannot testify as to causation, leaving

Manzione's analysis undisputed.

　　　In order to succeed on an excessive force claim, Plaintiff need not show that Defendant

inflicted an injury on him: the "absence of physical injury" does not necessarily indicate that the

"force has not been excessive."  *Sharrar*, 128 F.3d at 822.  Defendant, however, argues that

unless Plaintiff can show Defendant caused the specific injuries he suffered, then injury alone is

insufficient to establish an excessive force claim.  In making this argument, Defendant cites to an

unpublished Third Circuit case and a Seventh Circuit case in which the court held that the "mere

fact that an injury occurred" is not enough to avoid summary judgment on an excessive force

claim—the plaintiff "must identify the specific unreasonable conduct that caused" the

injuries. *Abdullahi v. City of Madison*, 423 F.3d 763, 770-71 (7th Cir. 2005); *see also Bornstad*,

211 F. App'x at 123-24 (holding that a plaintiff sustaining injury while detained by police is not

alone dispositive in an excessive force claim).  Unpublished and out-of-circuit precedent is not

binding on this Court's analysis of the present case.  Moreover, the cases Defendant cites do not

stand in conflict with the concept underlying *Sharrar*. Taken together, *Abdullahi* and *Sharrar* are

14

essentially opposite sides of the same coin: merely showing a plaintiff was not physically injured is not sufficient to hold that excessive force was not used—and conversely, showing that a plaintiff was injured is not itself sufficient to hold excessive force was used.  Instead, as discussed, excessive force turns on a multi-factor inquiry into the reasonableness of the official's actions.  *See supra* Section III.A; *Graham*, 490 U.S. at 397.

Causation is also relevant here in the context of compensatory damages.  Compensatory damages are only available to a prevailing plaintiff to the extent he can *prove* the constitutional violation *caused* his injury.  *See, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 258 (1978).  Such a showing embodies the traditional tort concept of requiring proximate cause between the defendant's actions and the plaintiff's injury.  *See Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000).  Thus, to recover damages for his physical injury Plaintiff must introduce evidence that Defendant's use of excessive force is what caused it.  *See Rivas*, 365 F.3d at 193.  And so if Williams is precluded from testifying about causation in any capacity, leaving Manzione's testimony that Defendant's actions would not have caused the fracture, it appears Plaintiff would be unable to recover compensatory damages for that injury.

Two questions are thus presented: Was Williams properly designated as an expert, and if he was not, can he still provide testimony from which a jury could conclude that Defendant's actions proximately caused Plaintiff's injuries?  The Court takes under advisement pending trial the argument raised in a motion in limine filed by Defendant regarding whether Williams was properly designated as an expert.[8]  That is because, even assuming, *arguendo*, that Williams was

---

[8] Plaintiff also filed motion in limine seeking to prevent Manzione from testifying about neurology or epileptology. Specifically, Plaintiff seeks to prevent Manzione from testifying that Plaintiff suffered from a "tonic clonic seizure," arguing that he is not an expert on this area of medicine, as required by *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  The outcome of this motion does not impact the resolution of summary judgment: a disputed fact regarding causation remains regardless.  As such, this motion is likewise taken under advisement.

not properly designated as an expert, there is still sufficient admissible evidence in the record from which a jury could find that Defendant's actions caused Plaintiff's injuries.

In considering the scope of admissible evidence, the starting point is the Federal Rules of Evidence's "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996) (internal quotation omitted). On top of that, the Third Circuit held that the testimony of a plaintiff's treating physician holds a particularly high level of relevance and usefulness, citing the example of social security cases, where treating physician testimony is afforded "greater weight [because] he is employed to cure and has a greater opportunity to know and observe his patient." *Id.* at 783.

When a treating physician is asked to form an independent opinion as to the cause of the plaintiff's injuries, however, such statements are generally considered expert testimony. *See, e.g.*, *Damiani v. Momme*, 2012 WL 1657920, at *4 (E.D. Pa. May 11, 2012); *Pease v. Lycoming Engines*, 2012 WL 162551, at *12 (M.D. Pa. Jan. 19, 2012). But it is well-established that "doctors are free to testify as to Plaintiff's statements to them during their care and treatment; as to their own examination, diagnosis, and treatment of Plaintiff; and as to Plaintiff's prognosis based on their observations during treatment" as lay witnesses. *Damiani*, 2012 WL 1657920, at *4; *see also Allen v. Parkland Sch. Dist.*, 230 F. App'x 189, 194 (3d Cir. 2007). Thus even if Williams is ultimately barred[9] from providing independent opinions as to the cause of Plaintiff's

---

[9] Even if it is ultimately determined that Plaintiff did not properly disclose Williams as an expert, that does not necessarily mean that his expert testimony must be excluded. District courts retain broad discretion to determine the appropriate sanction, if any, for belated disclosure of an expert. *See Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (listing factors the court must considering in determining whether to exclude a witness's testimony). It is worth noting that, in this instance, Williams' "narrative letter," which included a discussion on causation and prognosis, was disclosed within the discovery guidelines and before summary judgment motions were filed, let alone a trial scheduled. *Compare with McCann v. Miller*, 502 F. App'x 163, 172 (3d Cir. 2012) (noting that the plaintiff failed to disclose the existence of an expert until the eve of trial, prejudicing the defendant).

injuries because he was not properly identified as an expert, he can still testify as to any observations he made about Plaintiff's injuries during the course of his treatment, which may have included observations he made about the potential cause of the harm.   A jury may find this testimony probative on the issue of causation for compensatory damages, and as such, this factual issue will not be resolved at the summary judgment stage.[10]   *See Rivas*, 365 F.3d at 193 (explaining that causation is "normally a question of fact for the jury").

### D.  Can Plaintiff Recover Punitive Damages?

Finally, Defendant argues that punitive damages are unavailable in this suit.  According to Defendant, because punitive damages cannot be recovered against a municipality or officers in their official capacities, the request must be stricken, citing *Feingold v. SEPTA*, 517 A.2d 1270, 1276 (Pa. 1986).  Defendant is correct that punitive damages are not available against a municipality or officers in their official capacities.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263 (1981).  But Plaintiff sued Defendant in both his official and individual capacity, and it is well established that punitive damages can be awarded against a state official sued in such capacity.  *See Smith v. Wade*, 461 U.S. 30, 56 (1983).

Punitive damages can be assessed "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Id.*  As discussed, *supra* Section III.A, the allegations here are that Defendant intentionally applied force against an unarmed, handcuffed individual suffering from a medical emergency, and continued to apply such for even as he repeatedly cried

---

[10] It is also worth noting that, even were Plaintiff unable to prove specific injuries caused by Defendant, that does not mean he is necessarily left with no remedy or case.  In a section 1983 suit, "nominal damages . . . are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury."  *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986); *see also Pryer v. C.O. 3 Slavic*, 251 F.3d 448 (3d Cir. 2001) (noting the availability of nominal damages in the absence of compensatory damages).

out in pain.  It is for the jury to determine whether Defendant's actions in this case were motivated by evil intent or reflect a callous indifference to Plaintiff's federal rights.  *See Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F. Supp.2d 616, 637 (W.D. Pa. 2012) (noting that "whether or not the plaintiff is entitled to punitive damages is typically a question of fact for the jury to resolve").

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment shall be denied. The pending motions in limine shall be taken under advisement pending trial.

**June 5, 2020**                                  **BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE**

18